**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

PETER T. ENGLER and TRACEY
ENGLER,

                                  Plaintiffs,

                  v.                                                      No. 13-CV-575
                                                                          (CFH)
MTD PRODUCTS, INC. and CUB
CADET, LLC,

                                  Defendants.

_____

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

**APPEARANCES:**                                  **OF COUNSEL:**

HORIGAN, HORIGAN LAW FIRM            TIMOTHY HORIGAN, ESQ.
P.O. Box 250
49 East Main Street
Amsterdam, New York 12010
For Plaintiffs

BAILEY, KELLEHER LAW FIRM            JOHN W. BAILEY, ESQ.
Pine West Plaza 5, Suite 507
Washington Avenue Extension
Albany, New York 12205
For Defendants

WEGMAN, HESSLER LAW FIRM            PATRICK J. QUALLICH, ESQ.
6055 Rockside Woods Blvd.
Suite 200
Cleveland, Ohio 44131
For Defendants

**MEMORANDUM-DECISION AND ORDER**[1]

_____

[1] This case was referred to the undersigned by United States District Court Judge
Glenn T. Suddaby on the consent of all parties. Dkt. No. 22.

Plaintiffs Peter T. Engler ("Engler") and Tracey Engler (collectively "plaintiffs," where appropriate) bring this products liability action pursuant to the Court's diversity jurisdiction under 28 U.S.C. § 1332 against defendants MTD Products, Inc., which designed, manufactured, distributed, tested, sold, marketed, and assembled the Cub Cadet lawnmower; and Cub Cadet, LLC (collectively "MTD," where appropriate). Dkt. No. 30-1, at 35. On January 13, 2015, the Court addressed defendants' request to exclude Dkt. No. 39 from consideration on the motion for summary judgment. Dkt. No. 44-1, at 7-11. The Court granted the motion in part and denied it in part, permitting MTD the opportunity re-open discovery for the limited purpose of obtaining a supplemental statement from their proposed expert witness addressing the opinions presented in the affidavit of plaintiffs' proposed witness (Dkt. No. 39). Dkt. No. 48. MTD has chosen not to obtain this supplemental statement. Thus, the Court will proceed based on the materials currently within the record, including Dkt. No. 39. Presently pending before the Court is MTD's (1) motion for summary judgment (Dkt. No. 29); and (2) motion to preclude plaintiffs' proposed expert witness from testifying at trial pursuant to Fed. R. Civ. P. 704 (Dkt. No. 43). For the following reasons, the Court (1) grants in part and denies in part MTD's motion to preclude the testimony of plaintiff's proposed expert; and (2) grants in part and denies in part the MTD's motion for summary judgment.

## I. **Background**

### A. **Facts**

On or about July 2011, plaintiff Peter T. Engler visited Tractor Supply Company, a store in Oneonta, New York to look at available riding lawnmowers. Engler Dep. (Dkt. No

30-2), at 44-45.  Engler[2] did not purchase a mower at that time nor did he speak with staff about any of the mowers.  Id. at 47.  Engler returned to the store on April 29, 2010; this time with his mother-in-law, and purchased a Cub Cadet Lawn Tractor LTX1040 ("lawnmower"), which was manufactured by MTD.  Id. at 44-45.  When Engler returned to Tractor Supply on April 29, he knew which mower he wished to purchase; he did not rely on advertisements, brochures, or any staff recommendations in making this decision.  Id. at 48-49.  Engler's mother-in-law purchased the lawnmower for Engler's use.  Id. at 56.

On July 28, 2011, Engler was mowing his lawn at 250 Beaver Hill Road.  Dkt. No. 30-2, at 57.  Previously, Engler had used the lawnmower on six other occasions.  Id. at 61-62. He was able to mow his lawn without incident.  Id. at 126.  After Engler finished mowing his lawn, he parked the lawnmower at the top of his driveway.  Id. at 134.  After taking a short break, Engler started the lawnmower and drove down his driveway, turning right onto Beaver Hill Road, toward his in-laws' residence approximately three-quarters of a mile down the road.  Id. at 12, 123-25, 134, 154.  Engler had driven the lawnmower to his in-laws' home without issue about a month earlier.  Id. at 12, 64-65, 124.  A few seconds after turning out of his driveway, Engler realized that he had not placed the shift lever into forward gear and that the lawnmower was picking up speed without his depressing the gas pedal. Id. at 132-33, 135.  Engler realized the mower was not in gear because the lawnmower did not react when he pressed the gas pedal or pushed up the throttle.  Id. at 132.  Engler attempted to engage the brakes but this did not stop or slow down the lawnmower.  Id. at 131, 142-44.  He twice attempted to push the shift lever into forward gear, but it did not

_____

[2]  Unless otherwise indicated, use of the name Engler, refers to plaintiff Peter T. Engler.

engage.  Id. at 137.  Engler then turned the steering wheel slowly to the left to attempt a gradual right turn into his neighbor's driveway.  Id. at 131, 146.  Engler was unable to complete this turn and fell from the lawnmower about two feet from his neighbor's driveway.  Id. at 158, 162.  He landed approximately ten feet from the lawnmower.  Id. at 165.  Before being thrown from the mower, Engler noticed that the front right tire of the lawnmower had lifted approximately ten to twelve inches off of the ground.  Id. at 159, 161.  He also felt the left rear tire of the mower leave the ground, but did not see the tire lift.  Id. at 160.  Engler observed that the mower had come to a stop about fifteen feet past the point where he had fallen.  Id. at 171.  Engler stated that, when the mower came to a stop, it was upright on all four of its wheels.  Id.

## B. **Proposed Expert Witnesses**

### 1. **Plaintiffs' Proposed Expert**

Plaintiffs offer two reports, deposition testimony, and an affidavit from Ernest J. Gailor, a licensed Professional Engineer ("Gailor").  In his initial report, dated April 2, 2013, Gailor stated that he visually inspected the lawnmower on December 6, 2011 in order "to assess the condition of the machine."  Dkt. No. 30-1, at 103.  Gailor contended that the braking system in the subject lawnmower "is a simple disc/caliper system."  Id.  Gailor opined that "the calipers did not firmly engage the brake disc" which "allowed the machine to roll forward even when the brake was engaged.  The brake appeared to be out of adjustment."  Id.  Gailor also observed that the operator's manual had "no instruction for the adjustment of the brake," concluded that "[b]rake adjustment must be made by a service

technician," and provided that "[t]he brake is initially adjusted at the factory and shipped to distributors." Id. Finally, Gailor noted that the manual "cautions against using the machine on a cross slope that exceeds 15 degrees," and that "Engler was driving down a street with a 22 degree down slope and no appreciable cross slope." Id.

Gailor testified at a deposition on May 29, 2014. Dkt. No. 30-2 at 61-137. He testified that he made one request to take apart the lawnmower to inspect the parts on December 6, 2011. Id. at 81. He did not explain whether this request was addressed by MTD. Id. Gailor also testified that he "mentioned that it would be nice" to have tested the mower's brake pad "for compliance with the required type of pad material it had to have," but that he does not believe that he formally made the request. Id. at 80. Gailor stated that he was unable to discern the material make-up of the brake pads from photographs. Id. at 82. He stated further that he was not aware that defendants' expert Daniel Martens disassembled the lawnmower until he received Martens' report and photographs. Id. at 81. Gailor contended that he did not believe that there was a design defect with the lawnmower. Id. at 86. Gailor further contended that, at the time he inspected the mower in 2011, the brakes had "ceased to function." Id. at 89. He stated that the amount of wear on the brakes was more than expected given the low number of hours of use on the mower. Id. at 93. He agreed with the defense expert's conclusion that the mower's brakes had the equivalent of 300 hours of use. Id. He also agreed that the "abnormal wear" in the mower's system was "confined to the brake pads." Id. at 94. Gailor further agreed that if the brake pads on the mower were readjusted, the brakes would be fully functional. Id. at 95. He clarified that even if the brakes were readjusted, however, he did not believe that "the readjustment would stay in place very long before the rest of the pad would start to

deteriorate." Id.  Gailor did not know what caused the brake pads to come out of adjustment.  Id. at 96.  He defined "out of adjustment" as the "pads were not fully engaging the discs . . . ." because the outer pad "was too far away or worn to the point where it was too far aware [sic] from the face of the disc."  Id.  Gailor concluded that there existed premature wear of the brake pads.  Id. at 98.  However, he did not know the cause of the premature wear.  Id. at 99.

Gailor testified regarding the owner's manual.  Dkt. No. 30-2, at 100-101.  He stated that the manual provided that brake adjustments are to be completed by a service professional.  Id.  He testified that an operator needs an instruction or warning to take the mower to a service professional to have an adjustment if depressing the brake pedal did not bring the tractor to a complete stop.  Id. at 99.  Gailor further testified that such warning was "already there" in the operator's manual.  Id. at 100-101.  In response to an inquiry whether "there is any other instruction or warning that should have been on the product itself as it relates to brakes," Gailor responded in the negative.  Id. at 102.  He responded "I don't believe so" when asked if there was "any other instruction or warning that should have been in the manual as it relates to the adjustment of the brakes."  Id.  Further, when he was asked whether there were "any other criticisms that [he had] of any of the instructions or warnings" other than what he had set forth in his report, Gailor replied, "no."  Id. at 105-106.

Finally, in an affidavit sworn to on September 26, 2014, Gailor stated that "[a]fter being provided with the deposition testimony of the defense expert, Daniel Martens, and photographs taken during his inspection, I was able to supplement my initial report."  Dkt. No. 39, at 3 ¶ 7.  He provided that the brake pads experienced "greatly premature failure" in that the deterioration seen in photographs of the brake pads is "not expected, or even

remotely acceptable wear for a lawn tractor braking system only a year old and with only 27 hours of use." Id. Gailor concluded that "[i]n order to exhibit this type of wear in such a small amount of time, these brake pads had to be defective in their manufacture or integrity." Id. at 7. He further concluded that "[t]he premature failure of the brake pads eliminated any opportunity for [plaintiff] to stop the machine, and is the sole proximate cause of his inability to do so." Id. Gailor stated that "[w]hether the brakes were functioning properly and whether they were in proper adjustment is immaterial to their failure. The failure of the brakes in this case was due to premature wear, meaning the brake pads were defective." Id. at 5.

Gailor also contended that the operator's manual "contains no instructions for the owner to adjust the brakes" and that there is no "warning or highlighting" provided for brake adjustment. Dkt. No. 45, at 7. He concluded that "this omission indicates to the user that brake adjustment is not important. Id. Gailor noted that the "only mention of testing the braking mechanism is a mention of 'Parking Brake Adjustment'" which states that brakes may need an adjustment "'if the tractor does not come to a complete stop when the brake pedal is completely depressed, of [sic] if the tractor's rear wheels can roll with the parking brake applied and the shift lever in neutral." Id. However, Gailor was critical that this portion of the manual "is not highlighted by the standard exclamation point inside a triangle" and

> does not say how often a user should check the brake, or even if they should do so at all; and it fails to consider that the mower will come to a stop when the user lifts his right foot from the drive pedal without use of the braking system when on flat land.

Id. at 7-8. Addressing "[d]efendants' characterization of [his] testimony regarding

warnings," Gailor contended that his deposition statement about warnings being sufficient related to warnings for adjustment of brakes. Id. at 5. He stated that "[w]hile a further warning with regard to how to adjust the brakes might not have prevented this incident, a clear recitation or warning indicating how often to check the brakes and how to do so could certainly have exposed the premature wearing of these brakes." Id.

### 2. **Defendants' Proposed Expert**

Defendants' expert, Daniel J. Martens ("Martens"), Vice President, Product Development & Safety at MTD, performed an inspection of the subject lawnmower and accident site on March 12, 2014. Dkt. No. 39-2, at 129. The inspection of the lawnmower involved "remov[ing] and inspect[ing] the brake pads and brake disc of the subject lawn tractor." Id. Martens opined that "it is evident that the brakes were used extensively. Given the fact that the brake pads were worn, in addition to the amount of wear on the brake pads, it is apparent that the brakes were functional at the time of manufacture." Id. at 130. Martens disagreed with plaintiff's testimony that the only time he used the lawnmower's brakes were when he set the parking brake before and after each use. Id. Instead, Martens concluded that "[n]ormal use of the braking system of the subject tractor would not result in the amount of wear found on the brake pads." Id. He opined that such wear would not occur "under normal usage for a machine with only 39.1 hours of use." Id. Martens' inspection revealed that the original thickness of the inside brake pad was .285 inches, but at the time of testing, it was worn to .255 inches. Id. Similarly, the outer brake pad had an original thickness of .2925 and was worn to a thickness of .269. Id. Martens concluded that this wear "would create a gap of .0635 to

.0685 inches between the brake pads and disc.  Id.  Martens also concluded that the

wear on the pads "indicates extensive use and in fact, misuse of the braking system.  The

amount of wear on the brake pads indicates the braking system was functional before the

accident."  Id.

Martens opined that the "accident and resulting injuries to [plaintiff] were

proximately caused by [plaintiff's] own negligence in not following the warnings and

instructions both on the tractor and in the operator's manual."  Dkt. No. 30-2, at 130.

Martens further concluded that, at the time of its manufacture, the lawnmower was in

compliance with safety specifications.  Id. at 131.  Martens concluded that the lawnmower

"was not defective or unreasonably dangerous and designed and manufactured by MTD.

The lawn tractor was manufactured in accordance with MTD's specifications and was

free of any manufacturing defects."  Id.  Martens stated that "the warnings and

instructions provided with the lawn tractor, both by way of the on-product labeling and

those contained within the Operator's Manual, were sufficient and adequate for their

intended purpose" and he "d[id] not believe that any additional guarding, warnings,

instructions or product design changes were required for the lawn tractor to be

reasonably safe and suitable for consumer use when it's used as intended."

Id.  Ultimately, Martens concluded that the "cause of the accident was [plaintiff]'s conduct

of operating the subject lawn tractor in an unsafe manner on the day of his accident."  Id.

Martens testified in a deposition on April 1, 2014.  Dkt. No. 38-3, at 13-118.

Martens testified that he took apart the subject lawnmower.  Id. at 52.  When he

disassembled the brakes, he noticed that "the pads were worn, which caused it to be out

of adjustment, so the pedal was not allowing the brakes to work."  Id. at 52.  He

concluded that the wear to the brake pads caused the brakes to be out of adjustment.  Id. at 53.  That the brake pads were worn and out of adjustment were the only issues relating to the brakes that Martens discovered during his inspection.  Id.  Martens testified that his report concluded that the subject lawnmower's brakes were functional and in proper adjustment at the time of its manufacture because MTD's procedure is to "one hundred percent test every product before it's sold."  Id. at 63-64.  Martens based this opinion upon his "knowledge of the routine procedures that are performed" at MTD."  Id. at 72.  Martens further explained that wear on the brake pads indicated that the brakes were functional at some point.  Id. at 74.  He further concluded that the brakes showed wear indicating use in excess of 300 hours or approximately ten years of use.  Id. at 75-76.  Marten's inspection revealed "bluing" of the disc, which indicates that the brakes were hot which "only occurs at high speeds and applying brakes."  Id. at 87.

Martens proposed that one way the brakes could have been so worn despite the mower having only twenty-seven hours of use, is if plaintiff, on multiple occasions, drove the mower "down to his mother-in-law's house in neutral and coasting it and riding the brake down the slopes."  Dkt. No. 38-3, at 78-80.  Martens testified that he believed that plaintiff was "coasting" downhill when the accident occurred.  Id. at 89.  Martens was unable to think of an alternative cause of the wearing of the brakes.  Id. at 80.  Martens did not check the brake pads and disc to determine whether they had been manufactured to MTD specifications.  Id. at 81.

Testifying about the owner's manual, Martens noted that there is an instruction that the owner should "'[c]heck brake operation frequently as it is subject to wear during normal operation.  Adjust and service as required.'"  Dkt. No. 38-3, at 37.  Martens

explains that page twenty-three of the manual, the parking brake section, contained instructions for checking the parking brake. Id. Martens explained that the manual reads, "[i]f the tractor does not come to a complete stop when the brake pedal is completely depressed, or if the tractor [sic] rear wheels can roll with the parking brake applied and the shift lever in neutral, the brake needs adjustment.'" Id. at 38. The manual further states that the owner should "[s]ee your Cub Cadet dealer to have brakes properly adjusted." Id. Martens explained that the manual did not contain instructions for a consumer to adjust the brakes because "that is something that needs to be handled by a service technician to maintain that." Id. at 47-48. He explained that MTD does not "want to have the consumer adjusting the brakes themselves. We don't feel they have the knowledge, the technical background . . . ." Id. at 48-49. He further explained that an issue with the brakes may not be clear until the mower is taken apart. Id. at 52.

Martens further testified that the manual contained a warning to avoid sudden turns. Dkt. No. 38-3, at 57. Martens believes that plaintiff's description of his turn into the driveway appeared to be a "sudden turn" because "he did turn to the left and make a right turn. There [sic] was probably more speed related than anything." Id. at 57-58. Finally, Martens testified that the entire manual is "important" and the owner "ha[s] to read the entire manual in its entirety, front to back, and follow the instructions and warnings that are in it." Id. at 48.

II. **Motion to Preclude Plaintiffs' Expert from Testifying at Trial**[3]

MTD contends that Gailor should be precluded from testifying at trial because (1) he is not qualified under Rules 104 and 702 to render opinions "concerning the cause of the accident or the braking system" because he does not have the sufficient training or experience in those areas, and (2) his proposed testimony does not have a "sufficiently reliable foundation" under Fed. R. Civ. P. 702 and <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993). Dkt. No. 43-4, at 5, 13, 18.

1. **Legal Standards Governing Admissibility of Expert Testimony**

In fulfilling its gatekeeping role, the trial court is to look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant . . . ." <u>Seely v. Hamilton Beach/Proctor-Silex, Inc.</u>, 349 F. Supp. 2d 381 (N.D.N.Y. 2004) (quoting <u>Amorgianos v. Nat'l R.R. Passenger Corp.</u>, 303 F.3d 256, 265 (2d Cir. 2002)). Under the Fed. R. Civ. P., before a witness may be certified as an expert, the expert first must be "qualified" as an expert by his or her "knowledge, skill, experience, training, or education." FED. R. CIV. P. 702. "To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." <u>U.S. v. Tin Yat Chin</u>, 371 F.3d 31, 40 (2d

---

[3] Under Fed. R. Civ. P. 104(a), a court "must evaluate evidence for admissibility before it considers that evidence in a ruling on a summary judgment motion." <u>Colon ex. rel. Molina v. BIC USA, INC.</u>, 199 F. Supp. 2d 53, 68 (S.D.N.Y. 2001) (citing FED. R. CIV. P. 104(a) (additional citation omitted)). Thus, "[i]f a proffer of expert testimony is excluded as inadmissible pursuant to Rule 702, the court must make the summary judgment determination on a record that does not include that evidence.'" <u>Id.</u>; <u>see also</u> <u>Quiles v. Bradford White Corp.</u>, No. 10-CV-747, 2012 WL 1355262, at *3 (N.D.N.Y. Apr. 18, 2012) (same).

Cir.2004) (citation omitted).

After addressing whether the expert is qualified to testify, "the district court must determine whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered, making this determination with reference to the indicia of reliability identified in Rule 702." Id. (citation omitted).  Rule 702 provides that

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education, may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.  In Daubert, the Supreme Court of the United States provided factors for a court to consider in determining the "validity" or "relevance and reliability[ ]of the principles that underlie a proposed submission."  509 U.S. at 594-95.  These factors include, (1) whether the theory or technique on which the expert relies "can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error" of the technique or theory "and the existence and maintenance of standards controlling the technique [or theory's] operation"; and (4) whether there is, generally, wide-spread acceptance of the technique or theory in the relevant field/community.  Daubert, 509 U.S. at 593-94.  The Supreme Court made clear that "[t]he focus . . . must be solely on the principles and methodology, not on the conclusions that they generate."  Id. at 595.  Further, this is a "flexible" inquiry (Daubert, 508 U.S. at 593-94), and these factors "neither necessarily nor exclusively appl[y] to all experts or in every case."  Kumho Tire Co., Ltd. v. Carmichael, 526 U.S.

137, 152 (1999).  In Kumho Tire Co., the Supreme Court reiterated the rationale behind

consideration of Rule 702 and the Daubert factors: "to make certain that an expert,

whether basing testimony upon professional studies or personal experience, employs in

the courtroom the same level of intellectual rigor that characterizes the practice of an

expert in the relevant field."  526 U.S. at 152.  The Court also observed that the logic set

forth in Daubert expands beyond scientific experts to "'technical and' 'other specialized'

knowledge."  Id. at 141 (citing FED. R. CIV. P. 702).

      It is well settled that there is a "presumption of admissibility of evidence" under the

Federal Rules.  Borawick v. Shay, 68 F.3d 597, 610 (2d Cir. 1995).   Indeed, as this

District has recognized, the Second Circuit "has adopted a liberal standard for qualifying

as an expert."  Argonaut Ins. Co. v. Samsung Heavy Industries Co. Ltd., 929 F. Supp. 2d

159, 164 (N.D.N.Y. 2013) (citations omitted); see In re Rezulin Prods. Liab. Litig., 309 F.

Supp. 2d 531, 550 (S.D.N.Y. 2004) ("The Second Circuit has taken a liberal view of the

qualification requirements of Rule 702, at least to the extent that a lack of formal training

does not necessarily disqualify an expert from testifying if he or she has the equivalent

relevant practical experience."); see also Krause v. CSX Transp., 984 F. Supp. 2d 62, 74

(N.D.N.Y. 2013) (same).  As the Supreme Court explained in Daubert, "[v]igorous

cross-examination, presentation of contrary evidence, and careful instruction on the

burden of proof are the traditional and appropriate means of attacking shaky but

admissible evidence."  509 U.S. at 596.  Thus, "the rejection of expert testimony is the

exception rather than the rule."  Id.  However, "'when an expert opinion is based on data,

methodology, or studies that are simply inadequate to support the conclusions reached,

Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony."  Id.

(quoting Amorgianos, 303 F.3d at 265); see also Stagl v. Delta, 117 F.3d 76, 81 (2d Cir. 1997) ("[A] district court may properly conclude that witnesses are insufficiently qualified . . . [where] their expertise is too general or too deficient."). The burden is on the proponent of the expert testimony, in this case plaintiffs, to establish admissibility by a preponderance of the evidence. See Daubert, 509 U.S. at 592 n.10. Ultimately, the admissibility of expert testimony is within the purview of the trial judge who is granted "broad discretion" on this question. United States v. Feliciano, 223 F.3d 102, 120 (2d Cir. 2000); Palazzetti Import/Export, Inc. v. Morson, No. 98-CV-722, 2001 WL 793322, at *2 (S.D.N.Y. July 13, 2001).

2. **Analysis**

As a threshold matter, the Court observes that plaintiffs seek to qualify Gailor as an expert only in manufacturing and warning defects in riding lawn mowers. Dkt. No. 46, at 11, ¶3 ("Mr. Gailor is qualified as an expert witness to offer his opinions with regard to a manufacturing defect and failure to warn herein.");13 ¶5 ("[T]he relevant discussion here is not about the design of the tractor, but instead a defect in the manufacture of the components of the braking system of the tractor."). Thus, the Court will limit its analysis to the admissibility of Gailor's testimony as it relates to a defect in manufacture or warnings.

Gailor's proposed testimony is that (1) the lawnmower's brakes failed due to premature wearing of the brake pads caused by a manufacturing defect, and (2) the warnings relating to checking the brakes were insufficient and implied to the consumer that regular checking of brakes/brake maintenance is unimportant. Dkt. No. 39, at 1-2,

¶4.   Gailor, a Licensed Professional Engineer, has been employed by Harlan-McGee Associates of Saratoga, Inc. since 1991.  Dkt. No. 45, at 11-12.  His current title is Senior Forensic Engineer.  Id. at 2.  His Curriculum Vitae states that he provides "forensic consulting services" which includes

> Highway Engineering/Signage/Signalization/Accidents; Structural Analysis/Reconstruction/Accident Investigation; OSHA/ANSI Compliance/Safety Devices; Construction Means/Practices/ PPE/Safety Engineer; Construction Safety/Labor Law; Slip and Fall Accidents/Pedestrian Safety; Playground Equipment/Bleacher Design; Engineering Design Defects/Cost Analysis; Civil/Environmental Engineering/Structural Integrity; Golf Course Design/Wetlands/ Hydrology/Storm Water Analysis; Building Fire Protection and Building Code Analysis; Noise Surveys/Lighting Analysis

Id.  Gailor has been employed since 1985 as President of Harlan-McGee North America, PLLC (formerly Gailor Associates, PC), an engineering design and consulting firm.  Id. From 1984 to 1985, he worked as Director of Engineering at Saratoga Associates/Architects Engineers, and Landscape Architects.  Id.  From 1978 to 1984, he was employed with the United States Department of Transportation as an 801 General Engineer - OSHA Safety Officer.  Id. at 2.


a.  **Qualifications**

"The trial court's first step is to determine whether the proffered expert is qualified by virtue of some specialized 'knowledge, skill, experience, training, or education.'" Hilaire v. DeWalt Indus. Tool Co., 10-CV-7071 (ILG), 2014 WL 5025994, at *8 (E.D.N.Y. Oct. 8, 2014), __F. Supp. 3d__ (E.D.N.Y. 2014) (quoting Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998).  Generally, "expert qualifications are liberally construed."  Rondout Valley Cent. Sch. Dist. v. Coneco Corp., 321 F. Supp. 2d

469, at 474 (N.D.N.Y. 2004). A district court is to consider "'the totality of a witness's background when evaluating the witness's qualifications to testify as an expert.'" Argonaut Ins. Co., 929 F. Supp. 2d at 164 (quoting Keenan v. Mine Safety Appliances Co., No. 03-CV-0710 (TCP/ARL), 2006 WL 2546551, at *2-3 (E.D.N.Y. 2006). Thus, an expert will not necessarily be "precluded 'from testifying merely because he or she does not possess experience tailored to the precise product or process that is the subject matter of the dispute.'" Hilarie, 2014 WL 5025994, at *8 (quoting Yaccarino v. Motor Coach Indus., Inc., No. 03-CV-4527, 2006 WL 5230033, at *9 (E.D.N.Y. Sept. 29, 2006) (citations omitted); see also Rondout Valley Cent. Sch. Dist., 321 F. Supp. 2d at 475 ("As long as the expert has experience to support his opinion, explains how such experience leads to the expert's conclusion and demonstrates how the experience is reliably applied to the facts at hand, he should not be required to satisfy an overly narrow and rigid test . . . .") (citation omitted). When an expert's background is in a "general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." Deutsch v. Novartis Pharm. Corp., 786 F. Supp. 2d 420, 425 (E.D.N.Y. 2011) (citation omitted). "If the court finds some flaw in the expert's reasoning, the judge should only exclude the expert's testimony if that flaw is large enough that the expert lacks 'good grounds' for his conclusions." Seely, 349 F. Supp. 2d at 384 (citation omitted).

Gailor has a Bachelor of Science in Civil and Environmental Engineering from Clarkson University; Environmental Health, EPA, ANSI, DOL OSHA Construction/Industrial Accident Inspection from Cameron University; and Mechanical/Electrical/HVAC Design and Inspection from USDOT Monroney Aeronautical

Center.  Dkt. No. 39-1, at 3.  He is Asbestos Inspection certified, and certified as an

OSHA instructor and Playground Safety inspector.  Id.  Gailor testified that he has served

as an expert over twenty times and has been deposed on approximately eight-five

occasions.  Dkt. No. 30-2, at 62.  He has not been consulted before about the failure of a

lawnmower braking system.  Id. at 64.  In his capacity as a consultant, he has "reviewed a

lawn tractor's braking system" a "few times."  Id. at 63-64, 77.

MTD argues that Gailor's education and experience fail to qualify him to testify

regarding the cause of the accident, the mower's braking system, or the sufficiency of the

warnings and instructions.  Dkt. No. 43-4, at 5.  Specifically, MTD argues, among other

things, that Gailor has only a Bachelor's Degree in civil and environmental engineering,

and has completed no advanced academic course work in mechanical engineering.  Dkt.

No. 43-4, at 13.  Further, his work as a Senior Forensic Engineer largely relates to civil

engineering, with a focus on construction and highways, and nothing in his experience

"evince[s] that any of these positions involved adequate experience in the design of lawn

tractors, braking systems or similar machinery components." Id.  Additionally, MTD points

out that Gailor's recent work as an expert witness did not involve testifying about outdoor

power equipment, and he has never served as an expert "in the evaluation of an alleged

brake failure of a lawn tractor." Id. at 14.  MTD opines that Gailor "has never designed an

outdoor power equipment product"; "has never designed a consumer product"; "has

never worked for nor done consulting for a designer or manufacturer of outdoor power

equipment or brake designs"; "has no patents in the field of mechanical engineering or

brake design"; "has no teaching experience in the field of mechanical engineering or

brake design"; and "has never been a member of the industry safety standards

committee . . . or contributed to the development of such safety standards within the outdoor power equipment industry." Id. at 14-15.

### i. **Qualifications: Brake Failure/Manufacturing Defect**

Although Gailor does not have a mechanical engineering degree, having reviewed his CV, deposition testimony, and affidavits, the Court concludes that his proposed testimony would appear to "assist the trier of fact in some way." Keenan, 2006 WL 2546551, at *2 (citation omitted); see also Emig v. Electrolux Home Products, Inc., No. 06-CV-4791 (KMK), 2008 WL 4200988, at *5 (S.D.N.Y. 2008)("[I]t is well- settled that, to be an expert, a person need not hold a particular degree or license.  Indeed, it is not uncommon for a person to qualify as an expert based on his or her experience alone.")(citation omitted)).  Gailor testified regarding the "component parts of the braking system" of the subject tractor.  Dkt. No. 30-2, at 82-83, 94.  He also discussed the life expectancy of brake pads and of residential lawn tractors.  Id. at 84-85.  Further, he discussed how to test the thickness of brake pads, and offered testimony regarding various ways brake pads can be worn.  Id. at 90, 96, 98.  Gailor based his findings on his years of experience as a forensic engineer, which involved investigating accidents and equipment failures, along with his practical experience working on similar lawn mowers.  Dkt. No. 30-2, at 84.  Moreover, although Gailor has not worked for an outdoor power equipment designer or manufacturer, he has had some experience with compliance with national standards through his work consulting on whether power tools or other power equipment are American National Standards Institute (ANSI) compliant.  Dkt. No. 30-2, at 80.  Despite that Gailor has not testified about brake pad wear for a riding lawn mower,

he has testified as an expert regarding brake wear on large trucks.  Id. at 84.  Moreover,

although Gailor has not recently testified about lawn mower braking systems, he is not a

stranger to such systems; his recent experience disassembling braking systems for his

family's landscaping company on six to seven occasions (Id.) may be sufficient to assist

the trier of fact in understanding the make-up of a mower's braking system.  See In re

Rezulin Prods. Liab. Litig., 309 F. Supp. 2d at 550.  "Given the liberality with which courts

approach the issue of expert qualifications" (Emig, 2008 WL 4200988, at *5), to the

extent MTD maintains that Gailor's nonprofessional experience with lawn tractors, even if

combined with his professional experience testifying regarding brake wear, is "shaky,"

MTD will have the opportunity to challenge his knowledge and experience on cross-

examination.  Daubert, 509 U.S. at 596; McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1043

(2d Cir. 1995) (holding that dispute over an expert's qualifications go to the weight and

credibility afforded to the testimony, not to its admissibility).


ii. **Qualifications: Warnings**

Plaintiffs contend that Gailor is qualified to testify to the sufficiency of the warnings

and instructions in the manual due to his experience in "teaching and compliance

capacity" as certified trainer in Occupational Safety and Health Administration (OSHA)[4]

procedures and compliance.  Dkt. No. 46, at 13.

---

[4]  OSHA, a division of the United States Department of Labor, has a mission,
pursuant to the Occupational Safety and Health Act of 1980, "to assure safe and healthful
working conditions for men and women by setting and enforcing standards and providing
training, outreach, education, and assistance."  https://www.osha.gov/about.html (last
visited Mar. 2, 2015).

The Court concludes that plaintiffs have failed to meet their burden of demonstrating that Gailor is qualified to testify as an expert on the sufficiency of the instructions or warnings provided with the subject lawnmower.  See, e.g., Bourjaily v. United States, 483 U.S. 171, 175-76 (1987) (stating that the proponent of the evidence must establish admissibility under rule 104(a) by a preponderance of the proof).  Plaintiffs fail to explain Gailor's duties as an OSHA certified trainer or whether this role at all involved drafting or addressing the sufficiency of warnings for consumer products.  From what the Court can discern, Gailor's OSHA training relates to workplace safety.  See Dkt. No. 30-2, at 79 ("[A] lot of my investigations have to do with safety on a construction or work site."); see generally Bryne v. Liquid Asphalt Systems, Inc., 238 F. Supp. 2d 491 (E.D.N.Y. 2002) ("[T]estimony that the manufacturers in this case 'violated' [OSHA] standards would likely be greatly prejudicial and minimally probative considering that OSHA standards to not apply to manufacturers").  Further, the Court recognizes that Gailor appears to have had some experience with compliance with national standards through his consulting on whether power tools or other power equipment are American National Standards Institute (ANSI) compliant (Dkt. No. 30-2, at 78), however, Gailor testified that his review of the case did not involve whether the mower was compliant with ANSI, nor was he aware of the relevant ANSI standard for tractor lawn mowers.  Dkt. No. 30-2, at 78.  Gailor also testified that he has no experience drafting product warnings, instructions, technical literature, or owners' manuals.  Id. at 64-65.  The Court further notes that Gailor did not review other tractors' manuals in preparation for this case.  Id. at 77-78.  Further, Gailor's proposed testimony on warnings is that there was insufficient warnings about the frequency or importance of getting the brakes checked, which implied

to the operator that frequent brake checks are not important.  Gailor did not provide the basis of this testimony, and the Court concludes that such testimony is not based on any expert deduction, but an opinion.  Because the Court concludes that Gailor is not qualified to testify as an expert on warnings, the undersigned need not reach the reliability of his proposed testimony on this subject.  See Colon ex rel. Molina, 199 F. Supp. 2d at 73.

Plaintiffs have requested that the Court hold a Frye/Daubert hearing pursuant to Rule 104(a) to address Gailor's qualifications and the reliability of his testimony.  Dkt. No. 46.  However, it is within this Court's discretion whether it hold such hearing before declining to qualify a witness as an expert.  See, e.g., Colon ex rel. Molina, 199 F. Supp. 2d at 69 (citation omitted).  The Court finds that a Frye/Daubert hearing is unnecessary, as the only testimony Gailor proposed – that a failure to inform the operator how frequently to check the brakes and concluding that lack of this warning implies that regular checks are unimportant –  does not appear based on expertise or specialized knowledge.  United States v. Mulder, 273 F.3d 91, 101 (2d Cir. 1999) (holding that expert testimony is not considered helpful or relevant if it addresses "lay matters which the jury is capable of understanding and deciding without the expert's help").  Moreover, although the Second Circuit has held that pretrial evidentiary hearings under Rule 104(a) are "highly desirable," especially where exclusion of that testimony may be dispositive on a summary judgment motion, such concerns do not apply here, as it is well settled that expert testimony is not required for a claim of failure to warn.  Billar v. Minnesota Mining & Mfg. Co., 623 F.2d 240, 247 (2d Cir. 1980) (holding that "Under New York law, the jury does not need expert testimony to find a warning inadequate, but may use its own

judgment considering all the circumstances."). Gailor may testify as to the sufficiency of warnings as a lay witness, but not as an expert.

Accordingly, the Court grants defendants' motion to preclude plaintiffs' proposed expert insofar as he seeks to proffer expert testimony as to the sufficiency of the subject mower's warnings or instructions, as the Court finds the proposed witness unqualified to testify as an expert on this matter.

b. **Reliability**

Addressing reliability, "'the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case.'" United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007) (quoting Amorgianos, 303 F.3d at 266 (internal quotation marks omitted)). In Daubert, the Supreme Court of the United States provided factors for a court to consider in determining the "validity" or "relevance and reliability[ ]of the principles that underlie a proposed submission." 509 U.S. at 594-95. These factors include, (1) whether the theory or technique on which the expert relies "can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error" of the technique or theory "and the existence and maintenance of standards controlling the technique [or theory's] operation"; and (4) whether there is, generally, wide-spread acceptance of the technique or theory in the relevant field/community. Id. at 593-94. The Court made clear that "[t]he focus, of course, must be solely on the principles and

methodology, not on the conclusions that they generate." Id. at 595. Further, this is a "flexible" inquiry (Id. at 593-94), and these factors "neither necessarily nor exclusively applies to all experts or in every case." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999). In Kumho Tire Co. v. Carmichael, the Supreme Court reiterated the rationale behind consideration of Rule 702 and the Daubert factors: "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." 526 U.S. at 152. The Court also observed that the logic expands beyond scientific experts to include "testimony based on 'technical' and 'other specialized' knowledge." Id. at 141 (quoting FED. R. CIV. P. 702).

### i. **Reliability - Brake Failure/Manufacturing Defect**

Having found Gailor qualified to testify as an expert on brake failure/manufacturing defect, the Court must determine whether Gailor's proposed testimony is reliable. Plaintiffs contend that Gailor's testimony is reliable because Gailor's methods were reliable in reaching his conclusions regarding the premature brake failure. Gailor personally inspected the subject mower on December 6, 2011. Dkt. No. 30-2, at 65-66. He asked plaintiff engage the brake, and discovered he was able to easily push the mower forward, signaling to him that the brakes were not engaging. Dkt. No. 30-2, at 68-70. After MTD's proposed expert disassembled the mower, Gailor reviewed the pictures, measurements, and reports submitted by the proposed defense expert. Id. at 81-83, 88. It appears that Gailor requested to disassemble the mower, but that the request was denied by plaintiffs' counsel at the time. Id. at 68, 81. It is not necessary that Gailor

disassemble the mower himself, as he may properly rely on data collected by the proposed defense expert. Argonaut Ins. Co., 929 F. Supp. 2d at 166 (quoting Peerless Ins. Co. v. Marley Engineered Prod. LLC., 05-CV-4848 (AKT), 2008 WL 7440158, at *6 (E.D.N.Y. June 12, 2008). Gailor based his conclusion that the brake pads wore prematurely on his knowledge of the workings of braking systems, the appropriate range of clearance for an appropriate adjustment of a mower's brakes, the fact that the brakes on the subject tractor did not engage when he tested them, the mower's hours of use versus wear on the brake pads, and his personal experience disassembling other lawn tractor braking systems, and his knowledge of appropriate wear on brake pads in conjunction with the hours of use. Id. at 83-89.

The Court concludes that Gailor's opinions are grounded in reliable principles and methods, as he personally tested the brakes of the subject mower, reviewed data and pictures of the brakes collected by the proposed defense expert, and, applying his own experience, reached conclusions based on data and pictures collected from the defense expert. Dkt. No. 30-2, at 68, 81-84, 88-89, 93. Thus, the Court concludes that Gailor's methods are sufficiently reliable.

Accordingly, the Court denies defendants' motion to preclude plaintiffs' proposed expert from testifying as to premature brake wear and the existence of a manufacturing defect.

### III. **Motion for Summary Judgment**

Plaintiffs contend, under theories of strict liability and negligence, that the subject lawn mower suffered from (1) a manufacturing defect, (2) a design defect, and (3) a

defect in warnings.  Further, plaintiffs allege a breach of implied warranty.[5]  Defendants

move for summary judgment pursuant to Fed. R. Civ. P. 56.  (Dkt. No. 29).  For the

reasons stated below, the Court grants in part and denies in part the motion for summary

judgment.


## A.  **Standard of Review**

A motion for summary judgment may be granted if there is no genuine issue as to

any material fact, it was supported by affidavits or other suitable evidence, and the

moving party is entitled to judgment as a matter of law.  The moving party has the burden

to show the absence of disputed material facts by providing the court with portions of

pleadings, depositions, and affidavits which support the motion.  FED. R. CIV. P. 56 (c);

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Facts are material if they may affect

the outcome of the case as determined by substantive law.  Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248 (1986).  All ambiguities are resolved and all

reasonable inferences drawn in favor of the non-moving party.  Skubel v. Fuoroli, 113

F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine

issue for trial, and must do more than show that there is some doubt or speculation as to

---

[5]  Plaintiffs also raised a breach of express warranties claim in their complaint.
However, plaintiffs failed to oppose defendants' motion for summary judgment as it related
to these additional claims.  Plaintiffs' failure to oppose defendants' motion insofar as it
relates breach of express warranties amounts to abandonment of this claim.  See
Rizzo-Puccio v. College Auxiliary Servs., Inc., 216 F.3d 1073 (2d Cir. 2000) (concluding
that claims not addressed in opposition to defendants' motion for summary judgment were
deemed abandoned); Taylor v. City of New York, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003);
see also N.D.N.Y.L.R. 7.1(b)(3).

the true nature of the facts.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475

U.S. 574, 586 (1986).  For a court to grant a motion for summary judgment, it must be

apparent that no rational finder of fact could find in favor of the non-moving party.  Gallo

v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1223-24 (2d Cir. 1994);

Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).


## B.  **Applicable Law**

New York substantive law applies to all of plaintiffs' claims.  See generally Dalton

v. Steadman Machine Co., No. 05-CV-452, 2008 WL 351676, *1 (N.D.N.Y. Feb. 7, 2008)

(citing Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 427 (1996)).  "In New York,

a plaintiff injured by an allegedly defective product may seek recovery against the

manufacturer on the basis of any one or more of four theories of liability," including an

express or implied contract, negligence, or strict products liability.  Voss v. Black &

Decker Mfg. Co., 59 N.Y.2d 102, 106 (1983) (citing Victorson v. Bock Laundry Mach. Co.,

37 N.Y.2d 395, 400 (1975)).  "Although the available defenses and applicable limitations

principles of the various liability theories differ, there can be 'a high degree of overlap

between the substantive aspects' of the causes of action."  Monell v. Scooter Store, Ltd.,

895 F. Supp. 2d 398, 410-11 (N.D.N.Y. 2012) (quoting Denny v. Ford Motor Co., 87

N.Y.2d 248, 256 (1995).  "Since the Second Circuit has expressed no opinion on how the

New York Court of Appeals would rule on this issue, several courts have analyzed

plaintiffs' negligence and strict products liability claims under a single test."  Dalton, 2008

WL 351676, at *7 (citation omitted).  This Court will follow that approach.

There are

three distinct claims for strict products liability: (1) a manufacturing defect, which results when a mistake in manufacturing renders a product that is ordinarily safe dangerous so that it causes harm, (2) a warning defect, which occurs when the inadequacy or failure to warn of a reasonably foreseeable risk accompanying a product causes harm, and (3) a design defect, which results when the product as designed is unreasonably dangerous for its intended use.

McCarthy, 119 F.3d at 153 (citations omitted).


## 1. **Defective Design**[6]

To establish a design defect in a strict liability or negligence case under New York law, a plaintiff must demonstrate that (1) the manufacturer marketed a product designed so that it was not reasonably safe, as there existed a substantial likelihood of harm, and (2) the defective design was a substantial factor in causing the plaintiff's injury. Valente v. Textron, Inc., 559 Fed. Appx. 11, 14 (2d Cir. 2014) (quoting Voss, 59 N.Y.2d at 107); Rogers, 485 F. Supp. 2d at 127 n.11. It is well settled that it "is not enough . . . to demonstrate that a product is dangerous." Maxwell v. Howmedica Osteonics Corp, 713 F. Supp. 2d 84, 91 (N.D.N.Y. 2010). A plaintiff must engage in a risk-utility test, assessing

(1) the product's utility to the public as a whole, (2) its utility to the individual user, (3) the likelihood that the product will cause injury; (4) the availability of safer design, (5) the possibility of designing and manufacturing the product so that it is safer but remains functional and

---

[6]  In New York, "'[i]n a design defect case, there is almost no difference between a prima facie case in negligence and one in strict liability.'" Rogers v. Westfalia Assoc. Technologies, Inc., 485 F. Supp. 2d 121, 126 (N.D.N.Y. 2007) (quoting Bah v. Nordson Corp., 00-CV-9060, 2005 WL 181302, at *12 (S.D.N.Y. Aug. 1, 2005); Denny, 87 N.Y.2d at 258. Thus, the Court will address plaintiffs' negligence and strict liability design defect claims together.

reasonably priced, (6) the degree of awareness of the product's potential danger that can reasonably be attributed to the injured user, and (7) the manufacturer's ability to spread the costs of any safety-related design changes.

Denny, 87 N.Y.2d at 257. This analysis "must establish that a different design would have (1) led to improved safety and (2) been 'economically and technically feasible.'"

Maxwell, 713 F. Supp. 2d at 91 (citation omitted). Thus,

> in order to make out a prima facie case (and to raise a genuine issue of fact when confronted with a motion for summary judgement), [a plaintiff] must present some admissible evidence that there exists a technologically feasible and commercially practicable alternative design" that would have reduced or prevented the harm sustained by the plaintiff.

Soliman v. Daimler AG, 10-CV-408 (SJF/AKT), 2011 WL 6945707, at *5 (E.D.N.Y. Aug. 8, 2011)(quoting Guarascio v. Drake Assocs. Inc., 582 F. Supp. 2d 459, 463 (S.D.N.Y. 2008)). A design defect claim based on strict liability or negligence must fail where a plaintiff fails to allege a safer alternative design. S.F. v. Archer Daniels Midland Co, 2014 WL 6980449, at *1, ___ Fed. Appx. ___ (2d Cir. 2014); In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litig., 725 F.3d 65, 99 (2d Cir. 2013)(same); Gaudette v. Saint-Gobain Performance Plastics Corp., 11-CV-932 (MAD/RFT), 2014 WL 1311530, at *12 (N.D.N.Y. Mar. 28, 2014) (noting that the "showing of a feasible, alternative design is a *sine qua non* of a design defect claim.").

Under New York law, unless the reasonable alternative design is obvious and understandable to a layperson, a plaintiff seeking to establish a design defect is required to submit expert testimony as to the feasibility and efficacy of alternative designs. Maxwell, 713 F. Supp. 2d at 91. Whether a product is unreasonably dangerous is a question for the jury. Urena v. Biro Mfg. Co., 114 F.3d 359, 364 (2d Cir. 1997). However,

"it is only after [the] plaintiff has satisfied this burden of proving a safer, feasible alternative design that the jury goes on to weigh whether, under all relevant circumstances, the utility of the actual product outweighs the risk." Crespo v. Chrysler Corp., 75 F. Supp. 2d 225, 228 (S.D.N.Y. 1999) (citation omitted).

First, although it does not appear that plaintiffs attempt to present expert testimony as to design defect, the Court notes, for the sake of clarity, that plaintiffs will not be permitted to introduce testimony from Gailor that may purport to imply a design defect, as this Court has decided that Gailor is not qualified as an expert in such matters. Thus, plaintiffs will not be able to point to any specific defect in the design of the mower that caused Engler's injuries. Although expert testimony on an alternative design is not always required, as the average layperson would not understand the mechanics of a lawn tractor's breaking system or its brake pads, expert testimony on a safer, feasible alternative design is needed. See generally Guarasico v. Drake Assoc. Inc., 582 F. Supp. 2d 459, 463-64 (S.D.N.Y. 2008) (holding that expert testimony on "technologically feasible and practical alternative design" is needed unless a "reasonable alternative design is both obvious to, and understandable by, a layperson."). Plaintiffs have proffered *no* proposed alternative design, let alone a feasible, safer alternative design. Plaintiffs merely state, in a conclusory fashion, that they have met the Voss factors by demonstrating that plaintiff was using the mower for its intended purpose, the mower did not function as expected, and this failure was the proximate cause of the accident. Dkt. No. 41, at 14-15. Plaintiffs argue that they have met their burden of demonstrating a design defect because the happening of the accident and the fact that the mower did not perform as intended demonstrates that the mower was unreasonably safe. Id. Although

-30-

plaintiffs correctly recognize that, under New York Law, "a specific defect need not be proven by direct evidence, but may be shown through circumstantial evidence that the products did not perform as intended by the manufacturer" (Levine v. Sears Roebuck & Co., 200 F. Supp. 2d 180, 191 (E.D.N.Y. 2000); Humphrey v. Diamant Boart, Inc., 556 F. Supp. 2d 167, 172 (E.D.N.Y. 2008) (citation omitted)), plaintiffs have jumped to causation without addressing the first step of the design defect analysis.   Merely demonstrating that the product did not function as performed is insufficient to plead design defect. Maxwell, 713 F. Supp. 2d at 91.  Plaintiffs must first perform the risk-utility assessment discussed, as they bear the burden of demonstrating a safer, feasible alternative design. See, e.g., Soliman, 2011 WL 6945707, at *7 ("[I]n light of the fact that the Court has concluded that Plaintiff failed to provide sufficient evidence to satisfy the first to elements necessary to survive summary judgment on a design defect claim, the Court need not decide whether the alleged defective design was a substantial factor in causing Plaintiff's injury.") (citing Maxwell, 713 F. Supp. 2d at 94).[7]

As plaintiffs have failed to meet their burden of demonstrating a safer, feasible alternative design, defendants' motion for summary judgment is granted as to plaintiffs' claim for a design defect.

---

[7] Although Court has declined to qualify Gailor as an expert on design defect, it notes that, in its "Response to Defendants' Statement of Material Facts Pursuant to Local Rule 7.1" (Dkt. No. 40), plaintiffs "admit" that Gailor's testimony "confirms that there was no defect in the design of the lawn tractor," that Gailor's testimony "confirms that the design of the lawn tractor's braking system was appropriate and safe." Dkt. No. 40, at 5; Dkt. No. 31, at 7-8.

## 2.  **Manufacturing Defect**[8]

A manufacturing defect is "one which results from mistake or error made during the manufacturing process."  <u>Hare v. Hoveround Corp.</u>, No. 06-CV-1081 (NAM/GHL), 2009 WL 3086404, at *4 (N.D.N.Y. Sept. 23, 2009).  Under New York law, "a plaintiff must establish that the product was not built to specification or that it did not conform to the manufacturer's intended design" (<u>Minda v. Biomet, Inc.</u>, 182 F.3d 900, 900 (2d Cir. 1999) (citation omitted)) and that this defect was the cause of the plaintiff's injury. <u>Colon ex rel. Molina</u>, 199 F. Supp. 2d at 85.  In the absence of an identifiable flaw or defect, a "plaintiff initially may rely upon the circumstances of the accident and proof that the product did not perform as intended."  <u>Id.</u>; <u>Hare</u>, 2009 WL 3086404, at *4 (citing <u>Brown v. Borruso</u>, 238 A.D.2d 884, 885 (4th Dep't 1997)).  However, a jury may only make an inference that the product was defective when it left the manufacturer's control if the plaintiff excludes all other causes of the accident not attributable to the defendant's conduct.  <u>Selective Way Ins. Co. v. Nutone, Inc.</u>, 07-CV-457 (GLS/RFT), 2010 WL 3360127, at *5 (N.D.N.Y. Aug. 25, 2010) (citation omitted); <u>see</u> <u>also</u> <u>Riegel v. Medtronic, Inc.</u>, 451 F.3d 104, 125 (2d Cir. 2006) ("[I]n the absence of evidence identifying a specific flaw, a plaintiff must provide that the product did not perform as intended and exclude all other causes for the product's failure that are not attributable to defendants.").  If the

---

[8]  Claims alleging manufacturing defects are "analyzed identically under strict liability and negligence theories of recovery." <u>Gunn v. Hyrtrol Conveyor Co., Inc.</u>, 10-CV-43, 2013 WL 2249241, at *8 n.16 (E.D.N.Y. May 22, 2013). "The standard of fault in manufacturing defect cases is simply strict liability, regardless of whether the claim is characterized as negligence or strict liability." <u>Castaldi v. Land Rover N. Am., Inc.</u>, 06-CV-1008 (JG)(KAM), 2007 WL 4165283, at*11 (E.D.N.Y. Nov. 21, 2007) (citing <u>Colon ex rel. Molina</u>, 199 F. Supp. 2d at 96).

plaintiff makes this initial showing, the defendant, in moving for summary judgment,

> must submit proof in admissible form establishing that plaintiff's injuries
> were not caused by a manufacturing defect in the product. The burden
> then shifts to the plaintiff to demonstrate the existence of a triable issue
> as to whether in fact there was a defect. To meet that burden, a plaintiff
> cannot rely solely upon the occurrence of the accident, but must submit
> some direct evidence that a defect existed.

Minda, 182 F.3d at 900 (internal citations and quotation marks omitted).

Here, plaintiffs initially presented evidence of a manufacturing defect by "relying on the circumstances of the accident and proof that the product did not perform as intended." Hare, 2009 WL 3086404, at *4. Plaintiffs claimed that, while using the mower as it was intended, Engler was unable to engage the brake; and that the brake pads were worn and falling apart, showing the equivalent of over 300 hours of wear, despite the subject mower having only approximately twenty-five hours of use. Dkt. No. 30-1, at 7-8. In an attempt to exclude other possible causes of the accident, plaintiffs proffered, through Gailor's testimony, that operator misuse could not be the cause of the accident because plaintiff testified that he has never "freewheel[ed]," or drove down a slope in neutral, while using the tractor and made no modifications to the mower. Dkt. No. 30-2, at 27, 29; Dkt. No. 41, at 11-12.

In response, defendants presented the testimony of their defense expert, Martens, who testified that, based on his post-accident inspection of the subject mower and his knowledge of the testing that is performed on like mowers before they leave the defendant manufacturer, the subject mower's brakes must have been functioning at the time it left the manufacturer. Dkt. No. 38-3, at 72-73. Martens explained that, "to ensure that the product . . . complies with the safety standards that's in accordance with its

-33-

design specifications," certain mowers are "pulled off the assembly line at random and/or sent up to our facility for audits." Id. at 66. Martens conceded that, although he was unable to find the testing records for the subject mower, MTD "one hundred percent test[s] every product before it's sold." Id. at 63. Martens explained that, at the end of the assembly line, "[e]very machine is started and run and all the safety devices." Id. at 64. The testing performed before each mower leaves the manufacturer includes testing of brakes. Id. at 69. Further, Martens had access to testing records of mowers of the same model manufactured close in time to when the subject mower was manufactured, and those mowers were ANSI safety compliant. Id. at 68-72. Martens explained that he was able to conclude that the brakes on the subject mower were properly functioning at some point after the mower left the manufacturer because the brakes would not have been worn if they had not been, at one point, functional. Id. at 74. Because a manufacturing flaw "exists when the unit in question deviates in quality and other performance standards from all of the other identical units" (Colon ex rel. Molina, 199 F. Supp. 2d at 87), Marten's testimony on the testing results of other mowers of the same make that were manufactured by MTD close in time to the manufacture of the subject mower – when met with plaintiffs' testimony that the mower did not perform as intended through a result of normal and foreseeable use – creates an issue of fact as to whether, at the time it left the factory, the subject mower was free of defect.

Additionally, plaintiffs have failed to exclude all alternative causes of the accident as the only alternative cause of the accident that defendants attempted to debunk is operator misuse – which plaintiffs reject through Engler's testimony – "based on the record available, it is for the factfinder to resolve the extent to which other potential

-34-

causes can be excluded and whether a defect actually existed." Selective Way Ins. Co., 2010 WL 3360127, at * 5. Thus, construing the evidence in the light most favorable to plaintiffs, a reasonable fact finder could credit Engler's testimony that he did not drive down hill in neutral to conclude that premature wear of the brakes could not have worn prematurely due to the operator's misuse. See generally, Jarvis v. Ford Motor Co., 283 F.3d 33, 46 (2d Cir. 2002) (concluding that where the defendant argued the accident was caused by driver error, but plaintiff contended that she had her foot on the brake when the vehicle suddenly accelerated, a jury could reasonably accept the plaintiff's testimony and reject defendant's theory of an alternative cause of the accident).

Therefore, because there are issues of fact regarding whether plaintiff's accident resulted from a manufacturing defect in the subject mower's braking system, defendants' motion for summary judgment is denied as to this cause of action.

### 3. **Failure to Warn**

The elements of failure to warn are the same under strict liability and negligence. Fane v. Zimmer, 927 F.2d 124, 130 (2d Cir. 1991).[9] To prove a prima facie case for failure to warn under New York law, a plaintiff must demonstrate that (1) the manufacturer had a duty to warn, (2) the danger resulted from a foreseeable use about which the manufacturer knew or should have known, and (3) the manufacturer's failure to warn of the danger was the proximate cause of the plaintiff's injury. Gunn, 2013 WL

---

[9]    Although plaintiffs present failure to warn claims under both strict liability and negligence, these claims are "essentially equivalent"; thus, the Court will address these claims as one. See, e.g., Marshall v. Sheldahl, Inc., 150 F. Supp. 2d 400, 405 n.5 (N.D.N.Y. 2001)(citation omitted).

2249241, at *11, citing Colon ex rel. Molina, 199 F. Supp. 2d at 84.  Further, a plaintiff

does not have the burden, at the summary judgment stage, to show that an adequate

warning would have prevented his injury.  Liriano v. Hobart Corp., 170 F.3d 264, 271 (2d

Cir. 1999).  Indeed, "[t]he adequacy of the instruction or warning is generally a question

of fact to be determined at trial and is not ordinarily susceptible to the drastic remedy of

summary judgment."  Urena, 114 F.3d at 366 (citation omitted).  However, this district has

recognized two situations wherein failure to warn claims can be decided as a matter of

law

> (1) where the injured party was fully aware of the hazard through general
> knowledge, observation or common sense; and (2) where the danger at
> issue falls within the limited class of hazards [that] need not be warned of
> as a matter of law because they are patently dangerous or pose open and
> obvious risks.

Rogers, 485 F. Supp. 2d at 128 (citation omitted).  Furthermore, a plaintiff's failure to

read a warning is not dispositive.  Anderson v. Hedstrom Corp., 76 F. Supp. 2d 422, 445

(S.D.N.Y. 1999).  A plaintiff may argue that "the warnings, in addition to being

substantively inadequate, were insufficiently conspicuous or prominent and, thus, be able

to overcome his or her failure to read them."  Humphrey, 556 F. Supp. 2d at 180-81.

    Here, plaintiffs' failure to warn claim cannot be decided as a matter of law.  First,

the alleged hazard – premature wearing of brake pads – does not fall within one of the

narrow categories of that can be decided as a matter of law.  Although defendants

contend that there was no duty to warn because "[p]laintiff was well aware of how to use

the lawn tractor and the hazards posed by the lawn tractor," (Dkt. No. 32, at 18), in order

for the "knowledgeable user" exception to apply, "a plaintiff must have actual knowledge

of the specific hazard."  Barrett v. Black & Decker (U.S.) Inc., 06-CV-1970 (SCR/MDF),

2008 WL 5170200, at *10 (S.D.N.Y. Dec. 9, 2008) (citation omitted).  Thus, the issue is not plaintiff's knowledge of how to *operate* the lawn tractor, but whether issues with the tractor's braking system would be open and obvious to the average user.  Taking as true plaintiffs' claim that he did not misuse the mower, a jury may conclude that premature wearing of brake pads is not be a hazard that a layman would be aware of "through general knowledge, observation or common sense" (Rogers, 485 F. Supp. 2d at 445), especially because the brake pads are not visible without disassembly.  Dkt. No. 30-2, at 73-74.

Second, the "open and obvious" exception also does not apply here because premature wearing of a mower's brake pads, unlike the open and obvious danger of, for example, a swimming pool to a young child (Smith v. Hub Mfg. Inc., 634 F. Supp. 1505, 1508 (N.D.N.Y. 1986)) or a saw's blade to a carpenter (Barrett, 2008 WL 5170200, at *10), does not appear to be a danger that is so clear it obviates the need for warnings. Rogers, 485 F. Supp. 2d at 445.

Further, plaintiffs have demonstrated the existence an issue of fact whether an additional or more prominent warning would have prevented the injury.  Here, the only "warning" in the operator's manual that related to brakes advised owners to take the mower to a Cub Cadet dealer for a brake adjustment if "the tractor does not come to a complete stop when the brake pedal is completely depressed, or if the tractors rear wheels can roll with the parking brake applied (and the shift lever in neutral)."  Dkt. No. 30-2, at 127.  Plaintiffs suggest that the manual insufficiently warned the user of the need to have the mower's brakes regularly checked, and opine that, if an adequate warning had been provided, the "inadequacy of the braking system" would have been discovered

"and the accident could have been avoided."  Dkt. No. 41, at 12-13.  Although, at the time

of the mower's December 6, 2011 inspection, it appears that the tractor was able to roll

on flat ground when the brake was on (Dkt. No. 30-2, at 68-70), indicating a potential a

need for a brake adjustment, it is unclear whether this issue would have been apparent to

the user prior to the accident.  Indeed, Engler testified that, prior to the accident, he did

not have any difficulty with the mower or getting the parking brake to engage.  Id. at 18,

29-30.  Thus, even if the existing warning may have provided sufficient notification to the

user to have the brakes adjusted if the user noticed that the mower would roll when the

brake was engaged, what is less clear is whether this warning would sufficiently notify a

user of the need to have the brakes checked before they got to such a bad state.

Further, although, Engler did not read all of manual or even all of the warnings that

were highlighted by exclamation marks, plaintiffs have demonstrated that there exists an

issue of fact whether the existing warning was prominent or conspicuous enough so that

the user would notice it.   As noted, plaintiffs do not bear the burden at this stage as to

prove that an adequate warning would have prevented the injury.  Liriano, 170 F.3d at

271.  Thus, as plaintiffs have demonstrated that there is an issue of fact as to causation –

whether a more detailed and/or prominent warning would have led Engler to have the

brakes regularly checked, resulting in the discovery of the worn brake pads before the

occurrence of the accident, defendants' motion for summary judgment as to failure to

warn is denied.  See, e.g., Ramirez v. Komori America Corp., 94-CV-3083 (DAB), 1999

WL 187072, at *7 (S.D.N.Y. Apr. 6, 1999) ("A plaintiff's admission that he or she did not

reach such warnings that were provided on the product, need not necessarily sever the

causal connection between the alleged failure to warn and the accident, where a trier of

fact could still find that the plaintiff would have heeded a more prominent or urgent

warning.") (citation omitted).


### 4. **Breach of Implied Warranties**

"In a breach of implied warranty action, a plaintiff must demonstrate that the

product was not fit for the purpose for which it was intended." Clarke v. LR Sys., 219 F.

Supp. 2d 323, 331 (E.D.N.Y. 2002) (citing Codling v. Paglia, 32 N.Y.2d 330, 338 (N.Y.

1973); see also N.Y. U.C.C. § 2-314(2)(c). Thus, "[t]o establish a breach of an implied

warranty, a [p]laintiff must show "(1) that the product was defectively designed or

manufactured; (2) that the defect existed when the manufacturer delivered it to the

purchaser or user; and (3) that the defect is the proximate cause of the accident." Hayes

v. New York, 10-CV-1201, 2013 WL 5278879, at * 14 (N.D.N.Y. Sept. 18, 2013).

"Breach of warranty claims are distinct from strict products liability and negligence

causes of action, but there is a high degree of overlap between them and as a practical

matter, the distinction between the defect concepts in tort law and in implied warranty

theory may have little or no effect in most cases." Clarke, 219 F. Supp. 2d at 338

(quoting Denny, 87 N.Y.2d at 256). Despite these similarities, a breach of warranty claim

"does not involve a risk-benefit analysis but instead requires an inquiry into only whether

the product in question was fit for the ordinary purposes for which it was used." Bah,

2005 WL 1813023, at *12. Under a claim for breach of implied warranty, "[r]ecovery may

. . . be had upon a showing that the product was not minimally safe for its expected

purpose-without regard to the feasibility of alternative designs or the manufacturer's

reasonableness in marketing it in that unsafe condition." Id. Thus, a court may find there

was a breach of an implied warranty without finding that there was design defect, and vice versa.  See Denny, 42 F.3d at 111-12.

In opposition to the motion for summary judgment, plaintiffs contend that they have established a breach of implied warranty because Gailor's testimony "clearly establishes that the brake pads were unsafe and defective" and, thus, "not fit for their intended purpose of stopping the moving lawn tractor."  Dkt. No. 41, at 16. Drawing all reasonable inferences in plaintiffs' favor, a reasonable jury could conclude that the brakes' failure to function properly while being used in a proper and foreseeable manner demonstrates that it is not fit for its purpose.  See Arnold v. Krause, Inc., 233 F.R.D. 125 (E.D.N.Y. 2006) (denying summary judgment on the plaintiff's breach of implied warranty claim "[b]ased upon [the plaintiff's] description of the accident and his allegation that he was using the product as intended at the time. . . .").  MTD could, on the other hand, demonstrate that the mower was fit for its purpose and that the brakes failed due to operator misuse – Engler freewheeling or operating the mower on a slope greater than recommended.  Thus, as there is a question of fact whether the subject mower was being used for the purpose and manner intended, defendants' motion for summary judgment is denied on this ground.


IV.  **Conclusion**

For the reasons discussed above, defendants'

1. motion to preclude plaintiffs' proposed expert witness, Ernest J. Gailor, from
        testifying at trial (Dkt. No. 43) is:

a. **granted in part**, insofar as defendants seek to preclude plaintiffs' proposed

expert, Ernest J. Gailor, from testifying as an expert as to the sufficiency of

warnings/instructions; and

b. **denied in part**, insofar as defendants seek to preclude plaintiffs' proposed

expert Ernest J. Gailor from testifying as an expert as to the existence of a

manufacturing defect.  The Court concludes that Gailor will be permitted to testify

as an expert as to a manufacturing defect in the subject mower; and

2.  motion for summary judgment (Dkt. No. 29) is:

a. **granted in part**, insofar as defendants seek, pursuant to Fed. R. Civ. P. 56, to

dismiss plaintiffs' breach of express warranty and design defect claims; and

b. **denied in part**, insofar as defendants seek, pursuant to Fed. R. Civ. P. 56, to

dismiss plaintiffs' claims for manufacturing defect, breach of implied warranty, and

loss of consortium.


**IT IS SO ORDERED**.


Dated: March 2, 2015
Albany, New York

_Christian F. Hummel_
Christian F. Hummel
U.S. Magistrate Judge